UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
SOUTHERN DIVISION
at DAYTON

| | |
|---|---|
| ANDREW CARTER, ANTHONY TURCO, LAURA RALPH, and JAMES RALPH, individually and on behalf of all other Ohio residents similarly situated, | ) ) ) ) ) ) ) |
| | Case No.: 3:20-cv-00002 |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| SAFECO INSURANCE COMPANY OF INDIANA, LM INSURANCE CORPORATION, and LIBERTY MUTUAL FIRE INSURANCE COMPANY | ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## CLASS ACTION COMPLAINT WITH JURY DEMAND

COME NOW Plaintiffs Anthony Turco ("Turco"), Andrew Carter ("Carter"), and Laura and James Ralph (the "Ralphs"), and individually and on behalf of all others similarly situated, and for their Class Action Complaint against Defendants LM Insurance Corporation ("LMIC"), Safeco Insurance Company of Indiana ("Safeco"), Liberty Mutual Fire Insurance Company ("LM Fire") state and allege the following:

## PARTIES, RESIDENCY, JURISDICTION AND VENUE

1.      Carter is a citizen and resident of Montgomery County, Ohio. At all times relevant hereto, Carter owned a dwelling located at 10151 Stroud Lane, Dayton, Ohio (the "Carter Property").

2.      Turco is a citizen and resident of Butler County, Ohio. At all times relevant hereto, Turco owned a dwelling located at 7134 Lesourdsville, West Chester Road, Liberty Township, Ohio (the "Turco Property").

3.      The Ralphs are citizens and residents of Summit County, Ohio. At all times relevant hereto, the Ralphs owned a dwelling located at 229 Misty Lane, Copley Ohio (the "Carter Property").

4.      Defendant LM Insurance Corporation ("LMIC") is organized under the laws of the State of Illinois with its principal place of business in Boston, Massachusetts.  LMIC is authorized to sell property insurance policies in the State of Ohio, and is engaged in the insurance business in the State of Ohio, including Montgomery County.

5.      Defendant Safeco Insurance Company of Indiana ("Safeco") is organized under the laws of the State of Indiana with its principal place of business in Boston, Massachusetts. Safeco is authorized to sell property insurance policies in the State of Ohio and is engaged in the insurance business in the State of Ohio, including Butler County.

6.      Defendant Liberty Mutual Fire Insurance Company ("Liberty Fire") is organized under the laws of the State of Wisconsin with its principal place of business in Boston, Massachusetts. Liberty Fire is authorized to sell property insurance policies in the State of Ohio, and is engaged in the insurance business in the State of Ohio, including Summit County.

7.      Safeco, LMIC, and Liberty Fire, are all subsidiaries of Liberty Mutual Holding Company, Inc. ("Liberty Mutual"), which owns and controls each.

8.     Safeco, LMIC, and Liberty Fire (collectively "Defendants") engaged in the challenged claims handling practice in a uniform manner and pursuant to a uniform policy.

9.     Liberty Mutual operates a centralized adjustment operation in which its adjusters work on claims for multiple different entities, including Defendants, using the same policies and procedures challenged in this case for adjusting insurance claims.

10.    The events giving rise to the individual claims asserted by Carter that are the subject of this action occurred in the Southern Division at Dayton of the Southern District of Ohio. Liberty Mutual has insurance agents in the Southern Division at Dayton of the Southern District of Ohio for the conduct of its usual and customary business, including the sale of property insurance policies.

11.    On information and belief, this Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA").

12.    This Court has personal jurisdiction over Defendants because they have availed themselves of the privilege of conducting business and issuing insurance contracts covering structures in the State of Ohio.

**FACTS**

**A.  The Carter Property Insurance Policy and Casualty Loss**

13.    At all times relevant hereto, Carter was the insured pursuant to an insurance contract whereby LMIC agreed to insure, inter alia, the Carter Property against property damage, bearing Policy No. H3528138932040 (the "Carter Policy").

14.    The Carter Policy provided insurance coverage for direct physical loss to the buildings located on the insured premises, except as specifically excluded or limited by the Carter Policy.

15.     This lawsuit only concerns property insurance coverage for buildings, and not personal contents, such as clothes and furniture.

16.     Pursuant to the Carter Policy, Carter paid LMIC an annual premium in exchange for insurance coverage. The required premiums were paid at all times relevant to this Complaint.

17.     On or about May 29, 2019, the Carter Property suffered accidental direct physical loss by wind or hail-related circumstances (the "Carter Loss").

18.     The Carter Policy was in effect at the time of the Carter Loss, and the Carter Loss is compensable under the terms of the Carter Policy. As it relates to the Carter Loss, there is no applicable exclusion.

19.     Carter notified LMIC of the Carter Loss and made a claim against the Carter Policy.

20.     After its inspection, LMIC determined that the Carter Loss was covered by the terms of the Carter Policy.

21.     LMIC calculated its ACV payment obligation to Carter by first estimating the cost to repair or replace the damage with new materials (RCV), then subtracted depreciation.

22.     The Carter Policy does not define ACV so as to permit the withholdings complained of herein.

**B. LMIC's Calculation of the Carter ACV Payment**

23.     In adjusting Carter's claim, LMIC affirmatively and unilaterally chose to use a "replacement cost less depreciation" methodology to calculate the losses and make its ACV payment to Carter.

24.     LMIC did not calculate any portion of Carter's casualty loss by reference to or analysis of the alleged increases or decreases in the market value of his property, or the market value of any portion of his property. LMIC did not conduct an appraisal of the market value of any portion of the Carter Home.

4

25.     LMIC has waived, and is estopped from asserting, any right to contend that ACV should have been calculated under any methodology other than the methodology actually used by LMIC, specifically including any market value methodology.

26.     LMIC used commercially-available computer software to make its RCV, depreciation and ACV calculations.

27.     On or about June 6, 2019, LMIC calculated the RCV of Carter's damaged home at $7,798.12.

28.     LMIC then used the same Xactimate price list to calculate the depreciation for Carter's damaged home at $4,134.56.

29.     A copy of LMIC's estimate is attached hereto as Exhibit "1".

30.     Carter was underpaid, and deprived of the use of his money from the time he should have received it until the date he recovers the wrongfully withheld amounts, as more fully described below.

**C.  The Turco Property Insurance Policy and Casualty Loss**

31.     At all times relevant hereto, Turco was the insured pursuant to an insurance contract whereby Safeco agreed to insure, inter alia, the Turco Property against property damage, bearing Policy No. OK6688541 (the "Turco Policy").

32.     The Turco Policy provided insurance coverage for direct physical loss to the buildings located on the insured premises, except as specifically excluded or limited by the Turco Policy.

33.     This lawsuit only concerns property insurance coverage for buildings, and not personal contents, such as clothes and furniture.

34.     Pursuant to the Turco Policy, Turco paid Safeco an annual premium in exchange for insurance coverage.  The required premiums were paid at all times relevant to this Complaint.

35.     On or about April 10, 2019, the Turco Property suffered accidental direct physical loss by wind or hail-related circumstances (the "Turco Loss").

36.     The Turco Policy was in effect at the time of the Turco Loss, and the Turco Loss is compensable under the terms of the Turco Policy.  As it relates to the Turco Loss, there is no applicable exclusion.

37.     Turco notified Safeco of the Turco Loss and made a claim against the Turco Policy.

38.     After its inspection, Safeco determined that the Turco Loss was covered by the terms of the Turco Policy.

39.     Safeco calculated its ACV payment obligation to Turco by first estimating the cost to repair or replace the damage with new materials (RCV), then subtracted depreciation.

40.     The Turco Policy does not define ACV so as to permit the withholdings complained of herein.

**D. Safeco's Calculation of the Turco ACV Payment**

41.     In adjusting Turco's claim, Safeco affirmatively and unilaterally chose to use a "replacement cost less depreciation" methodology to calculate the losses and make its ACV payment to Turco.

42.     Safeco did not calculate any portion of Turco's casualty loss by reference to or analysis of the alleged increases or decreases in the market value of his property, or the market value of any portion of his property.  Safeco did not conduct an appraisal of the market value of any portion of the Turco Home.

43.     Safeco has waived, and is estopped from asserting, any right to contend that ACV should have been calculated under any methodology other than the methodology actually used by Safeco, specifically including any market value methodology.

44.     Safeco used commercially-available computer software to make its RCV, depreciation and ACV calculations.

45.     On or about April 22, 2019, Safeco calculated the RCV of Turco's damaged home at $21,462.20.

46.     Safeco then used the same Xactimate price list to calculate the depreciation for Turco's damaged home at $7,456.12.

47.     A copy of Safeco's estimate is attached hereto as Exhibit "2".

48.     Turco was underpaid, and deprived of the use of his money from the time he should have received it until the date he recovers the wrongfully withheld amounts, as more fully described below.

**E.    The Ralphs' Property Insurance Policy and Casualty Loss**

49.     At all times relevant hereto, the Ralphs were insured pursuant to an insurance contract whereby Liberty Fire agreed to insure, inter alia, the Ralph Property against property damage, bearing Policy No. H3228837601970 (the "Ralph Policy").

50.     The Ralph Policy provided insurance coverage for direct physical loss to the buildings located on the insured premises, except as specifically excluded or limited by the Ralph Policy.

51.     This lawsuit only concerns property insurance coverage for buildings, and not personal contents, such as clothes and furniture.

52.     Pursuant to the Ralph Policy, the Ralphs paid Liberty Fire an annual premium in exchange for insurance coverage.  The required premiums were paid at all times relevant to this Complaint.

53.     On or about March 27, 2019, the Ralph Property suffered accidental direct physical loss by wind or hail-related circumstances (the "Ralph Loss").

7

54.     The Ralph Policy was in effect at the time of the Ralph Loss, and the Ralph Loss is compensable under the terms of the Ralph Policy.  As it relates to the Ralph Loss, there is no applicable exclusion.

55.     The Ralphs notified Liberty Fire of the Ralph Loss and made a claim against the Ralph Policy.

56.     After its inspection, Liberty Fire determined that the Ralph Loss was covered by the terms of the Ralph Policy.

57.     Liberty Fire calculated its ACV payment obligation to the Ralphs by first estimating the cost to repair or replace the damage with new materials (RCV), then subtracted depreciation.

58.     The Ralph Policy does not define ACV so as to permit the withholdings complained of herein.

**F.   Liberty Fire's Calculation of the Ralph ACV Payment**

59.     In adjusting the Ralphs' claim, Liberty Fire affirmatively and unilaterally chose to use a "replacement cost less depreciation" methodology to calculate the losses and make its ACV payment to the Ralphs.

60.     Liberty Fire did not calculate any portion of the Ralphs' casualty loss by reference to or analysis of the alleged increases or decreases in the market value of their property, or the market value of any portion of their property.  Liberty Fire did not conduct an appraisal of the market value of any portion of the Ralph Home.

61.     Liberty Fire has waived, and is estopped from asserting, any right to contend that ACV should have been calculated under any methodology other than the methodology actually used by Liberty Fire, specifically including any market value methodology.

62.     Liberty Fire used commercially-available computer software to make its RCV, depreciation and ACV calculations.

63. On or about April 2, 2019, Liberty Fire calculated the RCV of the Ralphs' damaged home at $10,967.22.

64. Liberty Fire then used the same Xactimate price list to calculate the depreciation for the Ralphs' damaged home at $3,999.82.

65. A copy of Liberty Fire's estimate is attached hereto as Exhibit "3".

66. The Ralphs were underpaid, and deprived of the use of their money from the time they should have received it until the date they recover the wrongfully withheld amounts, as more fully described below.

**POLICY TERMS AND CLAIM SETTLEMENT PRACTICES**

67. The policies of insurance Defendants issued to Carter, Turco, the Ralphs, and other members of the proposed class provide RCV coverage for both total loss of and partial loss to covered dwellings and other structures and, in some cases, ACV coverage for certain structural components.

68. At all times relevant to this cause of action, Defendants' custom and practice has been to pay its RCV policy holders the ACV of covered loss claims, net of any applicable deductible. In order to qualify for additional payment and recover the full RCV of the covered loss where RCV coverage is available under the insurance policy, the insured party must repair, rebuild or replace the damaged property within a specific time frame and submit proof to Defendants that the repair or replacement was timely completed. Costs that exceed the amount of the ACV payment are the responsibility of the policy holder.

69. At all times relevant hereto, Defendants' methodology for calculating ACV has been to determine the cost of repairing or replacing the damaged property then deduct depreciation.

70.     In the context of insurance law, "depreciation" is defined as "[a] decline in an asset's value because of use, wear, obsolescence, or age."  BLACK'S LAW DICTIONARY 506 (9th ed. 2009).  Materials used in the repair or replacement of damaged property e.g. roofing shingles or metal, diminished in value over time due to use, wear, obsolescence, and age.  As such, these are assets that can be depreciated.  In contrast, labor is not susceptible to aging or wear.  Its value does not diminish over time.  Conceptually, and practically, depreciation simply cannot be applied to labor costs.

71.     The basic purpose of property insurance is to provide indemnity to policyholders. To indemnify means to put the insured back in the position he or she enjoyed before the loss – no better and no worse.  A policy that provides for payment of the ACV of a covered loss is an indemnity contract because the purpose of the ACV payment is to make the insured whole but not to benefit him or her because a loss occurred.  See APPLEMAN ON INSURANCE 2D § 3823. An RCV policy expands the basic concept of indemnity to include coverage for repairs and replacement costs that exceed the ACV of the loss.

72.     In order to recover the RCV of their covered losses, Plaintiffs and other proposed class members are required to pay the out of pocket the difference between the cost of materials and labor necessary to repair or replace the damaged property and the depreciated ACV payment they received from Defendants.  While an insurer may lawfully depreciate material costs in calculating the amount of an ACV payment owed to an insured, it may not depreciate labor costs. Defendants' failure to pay the full cost of the labor necessary to repair or replace Plaintiffs' damaged property in the ACV payments left Plaintiffs under-indemnified and underpaid for their losses.

73. Defendants materially breached their duty to indemnify Plaintiffs by depreciating labor costs associated with repairs to the Insured Properties in the ACV paymentss, thereby paying Plaintiffs less than what they were entitled to receive under the terms of the insurance contract.

74. The Ohio Department of Insurance has indicated that it is inappropriate and contrary to industry practice to depreciate labor costs when determining the ACV of structural damage claims.

**AMOUNT IN CONTROVERSY**

75. Upon information and belief, the amount in controversy with respect to the proposed class exceeds $5,000,000, exclusive of interest and costs.

**<u>Class Action Allegations</u>**

76. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on their own behalf and on behalf and all others similarly situated. This action satisfies the Rule requirements of commonality, numerosity, superiority, typicality, and adequacy of representation.

77. The proposed class which Plaintiffs seek to represent is defined as follows:

All Safeco, LMIC, and Liberty Fire policyholders who made: (1) a structural damage claim for property located in the State of Ohio; and (2) which resulted in an actual cash value payment during the class period from which "non-material depreciation" was withheld from the policyholder; or which should have resulted in an actual cash value payment but for the withholding of "non-material depreciation" causing the loss to drop below the applicable deductible.

In this definition, "non-material depreciation" means application of either the "depreciate removal," "depreciate non-material" and/or "depreciate O&P" option settings within Xactimate software.

The class period for the proposed class is the maximum time period as allowed by applicable law.

The class excludes all claims arising under policy forms expressly permitting the "depreciation" of "labor" within the text of the policy form and any claims in which the initial actual cash value payment exhausted the applicable limits of insurance.

78.     Plaintiffs reserve their right to amend the definition of the proposed classes through discovery. The following persons are expressly excluded from the classes: (1) Defendants and their subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; and (3) the Court to which this case is assigned and its staff.

79.     The members of the proposed class are so numerous that joinder of all members is impractical.  Plaintiffs reasonably believe that hundreds if not thousands of people geographically dispersed across Ohio have been damaged by Defendants' actions.  The names and addresses of the members of the proposed class are identifiable through records maintained by Defendants, and proposed class members may be notified of the pendency of this action by mailed, published and/or electronic notice.

80.     Common questions of law and fact exist as to all proposed class members and predominate over any questions affecting only individual proposed class members.  The questions of law and fact common to the proposed class include, but are not limited to:

A.     Whether Defendants' insurance policies allow Defendants to depreciate labor in calculating ACV payments for covered losses;

B.     Whether Defendants' insurance policies are ambiguous concerning the depreciation of labor costs in calculating ACV payments, and if so, how Defendants' insurance policies should be interpreted;

C.     Whether Defendants' depreciation of labor costs in making ACV payments for covered losses is a breach of the insurance contracts issued by Defendants to Plaintiffs and other proposed class members.

D.     Whether Plaintiffs and other proposed class members have been damaged by Defendants' breaches, as alleged herein, and if so:

1.     What is the nature and extent of those damages; and

2.     What relief should be awarded to Plaintiffs and other proposed class members.

81. Plaintiffs' claims are typical of the claims of all the proposed class members, as they are all similarly affected by Defendants' custom and practice of unlawful and unjust conduct and their claims are based on such conduct. Further, Plaintiffs' claims are typical of the claims of all proposed class members because their claims arise from the same or similar underlying facts and are based on the same factual and legal theories. Plaintiffs are no different in any material respect from any other member of the proposed class – all members of the proposed class had labor unlawfully depreciated by Defendants.

82. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the proposed class. Plaintiffs' interests do not conflict with the interests of the class they seek to represent. Plaintiffs have retained counsel who are competent and experienced in class action litigation and complex insurance-related cases and will fairly and adequately represent the interests of the proposed class. Plaintiffs and their counsel will prosecute this action vigorously.

83. A class action is superior to all available methods for the fair and efficient adjudication of this controversy. Joining all proposed class in one action is impracticable, and prosecuting individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most class members, a class action is the only procedural mechanism that will afford them an opportunity for legal redress and justice. Even if proposed class members had the resources to pursue individual litigation, that method would be unduly burdensome to the courts in which such cases would proceed. Individual litigation exacerbates the delay and increases the expense for all parties, as well as the court system. Moreover individual litigation could result in inconsistent adjudications of common issues of law and fact.

84.     In contrast, a class action will minimize case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of Plaintiffs and proposed class members.  These benefits would result from the comprehensive and efficient supervision of the litigation by a single court.

85.     No unusual difficulties are anticipated in the management of this case as a class action.

86.     Class certification is further warranted because Defendants have acted or refused to act on grounds that apply generally to the proposed class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the proposed class as a whole.

87.     Plaintiffs may seek, in the alternative, certification of issues classes.

88.     Rule 23(c)(4) provides that an action may be brought or maintained as a class action with respect to particular issues when doing so would materially advance the litigation as a whole.


**COUNT I**
**BREACH OF CONTRACT**
**(AGAINST ALL DEFENDANTS)**

89.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

90.     Defendants entered into policies of insurance with Plaintiffs and other members of the proposed class.  These policies govern the relationship between Defendants and Plaintiffs and other proposed class members, as well as the manner in which claims for covered losses are handled.

91. The insurance policies at issue were drafted by Defendants and are essentially identical in all respects material to this litigation.

92. Plaintiffs and other proposed class members complied with all material provisions and fulfilled their respective duties with regard to their policies.

93. The policies of insurance Defendants issued to Plaintiffs and other proposed class members state that in the event of a loss Defendants may fulfill their initial contractual obligation to an insured party by paying the ACV of the loss. At all times relevant hereto, Defendants' custom and practice has been, and is, to make such payments based upon Defendants' calculation of the ACV for the loss, net of any applicable deductible.

94. Defendants breached their contractual duty to pay Plaintiffs and other proposed class members the ACV of their claims by unlawfully depreciating labor costs.

95. Defendants' actions in breaching its contractual obligations to Plaintiffs and other proposed class members benefitted, and continue to benefit, Defendants. Likewise, Defendants' actions damaged, and continue to damage, Plaintiffs and other proposed class members.

96. Defendants' actions in breaching their contractual obligations, as described herein, are the direct and proximate cause of damages to Plaintiffs and other proposed class members.

97. Accordingly, Plaintiffs and other proposed class members are entitled to recover damages sufficient to make them whole for the amounts Defendants unlawfully withheld from their ACV payments as labor cost depreciation.

**COUNT II**
**DECLARATORY JUDGMENT AND RELIEF**
**(AGAINST ALL DEFENDANTS)**

98. Plaintiffs restate and incorporate by reference all preceding allegations.

99.     This Court is empowered by the Declaratory Judgment Act as codified at 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 to declare the rights and legal relations of parties regardless of whether further relief is or could be claimed.

100.     A party may seek to have insurance contracts, before or after a breach, construed to obtain a declaration of rights, status, and other legal relations thereunder adjudicated.

101.     Plaintiffs and members of the proposed class have complied with all relevant conditions precedent in their contracts.

102.     Plaintiffs seek, personally and on behalf of the proposed class, a declaration that Defendants' property insurance contracts prohibit the withholding of labor costs as described herein when adjusting losses under the methodology employed here.

103.     Plaintiffs further seek, personally and on behalf of the proposed class, any and all equitable relief available under the law that the Court deems necessary and proper to the administration of justice, including, but not limited to, identifying and locating policyholders, and notifying the same of the circumstances complained of and the restoration of their rights and remediation of their losses, and preclusion by Defendants in engaging in the conduct described herein, as may be permitted by law.

104.     Plaintiffs and members of the proposed class have suffered injuries.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request that the Court grant the following relief:

A.      Certify that this lawsuit may be prosecuted as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Appoint Plaintiffs and Plaintiffs' counsel to represent the proposed class;

16

C.      Declare that Defendants have breached their contractual obligations to Plaintiffs and the proposed class by depreciating labor costs;

D.      Award Plaintiffs and the proposed class damages in an amount equal to the total amount of depreciated labor costs withheld on Plaintiffs' and proposed class members' claims that has not been paid to Plaintiffs and proposed class members;

E.      Award Plaintiffs and the proposed class prejudgment and post-judgment interest on their liquidated and unliquidated damages;

F.      Enjoin Defendants from engaging in the unlawful and unjust conduct complained of herein;

G.      Award the proposed class all expenses and costs of this action, and require Defendants to pay the costs and expenses of class notice and claims administration;

H.      Trial by Jury; and

I.      Any and all other relief to which Plaintiffs and the other proposed class members appear to be entitled.

Respectfully submitted,

*/s/ Stephen G. Whetstone*
STEPHEN G. WHETSTONE (0088666)
Email: steve@whetstonelegal.com
**Whetstone Legal, LLC**
P.O. Box 6
2 N. Main Street, Unit 2
Thornville, Ohio 43076
Telephone: 740.974.7730
Facsimile:  614.829.3070

*Trial Counsel for Plaintiffs and the Proposed Class*

and

ERIK D. PETERSON (KY Bar 93003)*
**Mehr, Fairbanks & Peterson**
 **Trial Lawyers, PLLC**
201 West Short Street, Suite 800
Lexington, Kentucky 40507
Telephone:  859-225-3731
Facsimile:  859-225-3830
Email: edp@austinmehr.com

*Co-counsel for Plaintiffs and
the Proposed Class*

*\*To be admitted pro hac vice.*